Council, you may proceed. May it please the Court, Radeek Shah for the Tribal Appellants. I will be sharing argument time today with Counsel for the State, Mr. Elman. There are three questions on appeal. With the Court's permission, Mr. Elman plans to briefly address the sovereign immunity issue. I plan to address the other two issues and handle rebuttal. Now, I'm happy to answer any questions about the settlement of land claim issue, but I'd like to focus my affirmative argument on the compact claim. Counsel, of course, you're aware that your side has a total of 20 minutes, so if you're forecasting a rebuttal, you need to budget that time. Yes, Your Honor. I'll try my best to reserve the time. Very well. Now, on the compact claim, that is, I want to focus on the claim that by opening a Phoenix area casino, the defendant nation would breach the compact at issue. Overwhelming record evidence establishes the consistent understanding during negotiations that gaming would proceed on a market-by-market basis, such that the Tucson area tribes, including the nation, could not open a casino in Phoenix. Indeed, there would be no — Paragraph of the — excuse me, what paragraph of the compact says they can't do that? Your Honor, there is no explicit limitation along those lines that specifically says the you don't need that explicit notation. In fact, you don't even need ambiguous language before you apply the parties' understandings. In the Taylor case, for example, the Arizona courts — So if it's not there, how do we — how do we get to where you want to be? So, Your Honor, I think there's several indications in the compact, and I think the two provisions to focus on are within section 3C of the compact. And if it's helpful to follow along, those appear in the red brief in the back of the nation's brief on page 3A of the addendum. And the first provision I would turn to is section 3C-5. That's, again, on addendum 3A of the nation's brief. At the back of their brief is the easiest place, I think, to find it. That is the gaming device allocation table. And I think there are a couple features in that table which point and reinforce the clear understanding that the state and the compacting parties had that this would proceed on a market-by-market basis and that Tucson area tribes could not open a Phoenix casino. So the first is in the first column — But the compact itself authorizes class 3 gaming, does it not? It does authorize class 3 gaming. There's no dispute about that. But there are restrictions on the location of that gaming in section 3C. Now, 3C — I'm looking at 3C. Where does it talk about location? Okay. So 3C — so 3C-5 is the gaming chart. Now, what you'll notice is the first column are the tribes. Those are grouped by geographic locations. There's no dispute that these are geographic locations. The bottom two tribes, the Tohono O'odham Nation and Pascua Yoyaki, are the Tucson area tribes. The next four tribes up are the Phoenix tribes. The rest of them are rural tribes. Now, if there's any dispute about that, it's illuminated by Excerpts of Record 472, which puts explicit labels on that. When it talks about the Phoenix area tribe, it says the Mara County market area. Excerpts of Record 472 says when you're Phoenix tribes are talking about the Phoenix market, the two Tucson tribes are labeled Tucson market area. And when you're talking about their casinos, you're talking about the Tucson casinos. Now, that is repeated in every version of the gaming chart. If you look in the excerpts from 455 all the way through 472, you see the arc of the negotiations. On prior versions of the table, everyone has a footnote for each Phoenix area tribe that says they will be negotiating the allocation of machines and facilities amongst the Phoenix tribes, market parity, and the same for the Tucson tribes, footnotes saying they will negotiate between Phoenix and ensure Phoenix market parity. Now, the second indication in this table in 3C5 is the last column, which is entitled Revised Gaming Facility Allocation. That column is not only allocating the number of facilities, but it's doing so with the geographic, implicit geographic limitation. And here's how we know that, Your Honor. When you look at the four Phoenix area tribes, which again are grouped together in the table, Auchtin, Fort McDowell Salt River, and Gila River Indian Community, you will see- Counsel, would you help me? What page of the ER are we looking at? We are looking at page, it's addendum page 3A of the nation's brief. The brief? Yes. In the ER, it's 739. 739, whichever is easier for you to find. Yep, it's the same, exact same page. Now, what you'll see in column four, Revised Gaming Facility Allocation, that has with it not just the number, but there's an implicit geographic limitation. If you look at the four Phoenix area tribes that are grouped together, Auchtin, Fort McDowell Salt River, and Gila River, you compare columns three and four. This was a painstaking, critical part of the negotiations. Each of those tribes agreed to reduce their right to build an additional casino in Phoenix. Each of the numbers in column four are one less than their previous gaming allocation. Huge part of the negotiations, ample mountain of evidence in the record, that each of them agreed to do this to satisfy the state's requirement that there would be no additional casinos in Phoenix. Now, that negotiation and that result, each of the Phoenix tribes agreeing to take one less casino, not build an extra casino in Phoenix, makes absolutely no sense if they agreed on those painstaking negotiations and a Tucson area tribe, which had no voice in the negotiation about Phoenix area casinos, could simply drop a casino in Phoenix. The other side does not provide any coherent account as to why you would have three years of negotiations reaching that compromise, and it could simply be subverted by a Tucson area tribe building a casino in Phoenix. The third indication within section 3C5, this gaming chart I would point to, and again, the other side has no coherent explanation here of this, is the number four when it refers to the Tohono O'odham Nation's allocation. Now, that four allocation of four casinos, you'll see their allocation did not reduce by any. They kept four casinos. That was a sticking point in the negotiations, and there's undisputed evidence about this, and even the Nation doesn't dispute this. The reason why they were, everyone agreed that they could keep four casinos is because one of those casinos would be kept in a rural area, the other three in Tucson. That's made explicit on ER page 472, when you see the number four, and the number four is defined right next to it as three casinos within the Tucson, Arizona, plus the current rural facility at Y. Now, if you look at the intrinsic evidence, now I'm not even talking about extrinsic evidence. That notation, that the four casinos that the Nation would have would be three casinos in Tucson and one rural facility, that was then codified in the compact, in section 3C3 of the compact. So just a couple provisions up in the compact. That footnote was essentially made into 3C3, and it's on page, addendum page 2A of the Nation's brief, if you're looking there. And what that provision says is, if the tribe is the Nation, and if the tribe operates four gaming facilities, then at least one of those four facilities shall be at least 50 miles from the gaming facilities in the Tucson metropolitan area. Now, our claim is not that this new Phoenix Casino would violate that provision, but this provision would make absolutely no sense. It would essentially read it out of the compact if you accepted their reading. And that is because, under their reading, they could simply move all four casinos to Phoenix, because Phoenix is 50 miles outside of Tucson. But that would Why doesn't Section J let them do that? Well, Your Honor, it doesn't let them. It would clearly flout the undisputed purpose. The undisputed purpose of 3C3 is to limit the fourth casino to a rural area. That purpose is served if and only if Tucson is the sole metropolitan area in which the Nation can build a casino. If they can build in other metropolitan areas, then you might as well put a big X through 3C3. They simply, it does not serve any rural limitation at all unless you read the gaming chart in 3C5 to read it as every compacting tribe and the state read it, which is to impose a geographic limitation. The Phoenix area tribes could build casinos in Phoenix. The Tucson area tribes could build casinos in Tucson. The footnote Count for the fact that the section entitled Location of Gaming Facility doesn't contain what you're saying. Well, Your Honor, in Section 3J, are you talking about the location there? Well, Section 3J is not the only limitation on location. And you don't have to look any further than 3C3 in the compact. That is clearly limiting locations of facilities. And so the argument that everything about location has to be in 3J just doesn't make any sense as to how the parties set up this compact. Location is addressed. We have a section called Location of Gaming Facility. It's sort of expected to be discussing the location of the gaming facility. Your Honor, there's no dispute that 3J does discuss location, but 3C3 is an explicit, is an explicit provision on location. It discusses the location of the nation's facilities. If the nation operates so many casinos, then it talks about where they may be present. That provision would not, would not limit the nation to a rural casino under the nation's current reading of the, the gaming compact. And that would flout the undisputed purpose. It would make a mockery of the compact. One of the sticking points in the negotiations were no additional casinos in Phoenix and that the nation, if they were to build four casinos, one of them has to be a rural casino. Under their reading tomorrow, the nation could move that rural facility in Y smack dab into Phoenix or smack dab into Tucson and not, not violate the compact. That is not what the parties intended. Every indication, there's no coherent account that they can provide from the extrinsic evidence from the three years of negotiations that would give effect to that result. Are you proposing that ER749J1 is a general, a statement as to the location and you're pointing to ER739 number of gaming facilities is a specific one and the specific takes precedence over the general? Yes, Your Honor. I think that's a, I think that is a good way to put it. And you can see that from 3C. 3C is obviously setting up restrictions on the number and locations of facilities. It does that by its terms in 3C3. And again, there is no coherent account of the, of the gaming compact if you don't give voice to that geographical market by market limitation. There was undisputed evidence, the tribes jointly and the nation itself numerous times put out statements that one of the governing principles of this compact would be that there would be no additional casinos in the Phoenix market. The voters of Arizona approved the compact on that basis. The state of Arizona negotiated it. The other not 20 compacting tribes signed this compact based upon that understanding. Under Arizona law, and the other side will say, but there is no explicit limitation on Arizona law. You don't need that explicit limitation. You don't even need facial ambiguity under the Johnson case. The Arizona court of appeals said in that particular case, and that was a lease case. And it was whether premises, the term premises, which was defined in that contract as three suites within a building. Does that include a parking spot? Well, the contract itself defined premises as three seats, suites within a building did not make any mention of a parking spot at all, could not be clear. The court even said this contract is facially unambiguous and controverts and rejects the plaintiff's position on appeal. What the Arizona court said as well, when you look at the extrinsic evidence and it applied restatement section 201, it says you look at the party's understandings. And if you can give, if it's not inconsistent, if you can find indications in the agreement that gives effect to the party's understanding, then we will do that. And they said, yeah, the party's intended to include a parking spot. And so we're going to do that. Same thing here. Every indication is that the party's here, uh, intended to limit the casinos in Phoenix and have this market specific market limitation imposed in the, uh, in the agreement. Mr. Shah, may I take you to another issue and view your time? Are you making the claim that the purchase of parcel two was not within the meaning of part of a land settlement claim within the meaning of section 2719 because the $30 million, which was given by the government to the tribe could have been used for other purposes. And therefore the purchase of land number parcel number two was not an essential part of a settlement for a land claim. Your honor, I don't think I would push our argument that far. I think our argument is, is a little because I didn't see that in your opening brief and I saw it in a footnote at page 11 of your reply brief, but not very well developed or you're not making that. I wouldn't stand on that argument. Yep. And I'd like to reserve time for the, for the state and for rebuttal. Please. Your side has six minutes left. Counsel. Good morning, your honor. May it please the court. Robert Ellman for the state of Arizona. To be clear, if the compact already reflects the geographic limitation that the state bargained for, then there will be no need for the court to address whether IGRA's abrogation provisions include the state's claims that the nation obtained the compact through fraud or misrepresentation. However, if the court does construe the scope of IGRA's abrogation under subsection D782, we simply ask that this court take the same approach that the 10th circuit took in the Mescalero case and declined to create an unwarranted exception for causes of action that go to formation or validity. Once a compact goes into effect under subsection D3B, a state can seek injunctive relief based on any cause of action that challenges the lawfulness of class three gaming activity. IGRA can only work if both parties are negotiating in good faith. So the abrogation provision has to be at least broad enough to, to prohibit not only the state, but the tribes from making empty promises during good faith negotiations only to invoke immunity to repudiate them after the compact goes into effect. No other construction will achieve the statute's purpose of fairly balancing the many competitive economic interests at stake with Indian casino gaming. Your Honor, I'd like to reserve the rest of our time for rebuttal if you have any questions. You may do so, counsel. Thank you. We'll hear from the nation. May it please the court. The compact in this... Counsel, would you identify yourself for the record? Oh, I'm sorry. I'm Seth Waxman. Some of us know you very well, but we still need to have it on the record. Thank you. I often need to be reminded myself. I'm Seth Waxman, representing the nation. May it please the court. The compact expressly permits the nation to game anywhere that is permitted by IGRA, including on lands acquired in settlement of a land claim. The district court, in a very careful set of rulings, considered all of the plaintiff's purported extrinsic evidence in the light most favorable to them. We, for the record, vigorously dispute their assertions of fact, but nonetheless, as Judge Campbell recognized, none of that can change the express authority in the compact to game anywhere on the nation's Indian lands into a prohibition on gaming in Phoenix. The court correctly held, quote, that no reasonable reading of the compact could lead a person to conclude that it prohibited new casinos in the Phoenix area. Now, the plaintiff's argument is essentially an argument that this additional term should be implied as an additional consistent term, but the compact in this case includes the most uncompromising integration clause that provides in paragraph in section 25, quote, the compact contains the entire agreement of the party and no other statement, agreement, or promise shall be valid or binding. Yes, Judge Bailiff. Mr. Waxman, is your contention that the tribe can locate a gaming facility on any Indian land which is eligible based on ER 749 location of gaming facility? I'm sorry. What was the record site? 749, J1. Yes. So point out to me where it says the tribe can place the casino on any land whatsoever because I thought that's what you said. Oh, no, no, no. On any Indian land. Indian lands is a defined term in paragraph 2S. Right. So any Indian land is a general proposition. The position of the appellants is that any Indian land is specifically limited by C3, which we were discussing earlier. How do you meet that? That's correct. The State of Arizona wanted – I'm leaving aside the express language of C3 for a minute. The State of Arizona basically offered the tribes the opportunity to have more machines in exchange for fewer facilities, and a number of tribes agreed to do that, including the tribes that Mr. Shah was referring to. The nation refused to do it because it is not purely a metropolitan tribe, nor is it a Tucson tribe rather than a Phoenix tribe. It has reservation lands in a number of parts of the state, much of which is rural, and it explained – there's no dispute about this – that it had a rural casino in Y, Arizona that essentially made no money but provided employment, and they wouldn't reduce the number of casinos to three because if they kept a rural casino, they wouldn't be able to use the number of machines that the state was allowing the larger tribes, and the nation is the second largest tribe in the state. So as to location, Mr. Shah is quite correct that in general what the compact says is the nation may game on any of its Indian lands, including lands covered by Section 2719. However, if it operates a fourth casino, that casino must be located at least – I think it's 25 miles or 50 miles from its existing casinos in Tucson. And is the casino in Phoenix on Parcel 2, the one they proposed, a fifth casino? No, no, no, no, no. It would be the fourth. The casino is still in Y. Why isn't the general location of gaming facility grant at ER 749 and J1 limited by the specific description of the four casinos at ER 739, C3? Judge Baird, we agree that it is. Judge Campbell agreed that it was and noted that because the facility in Y, which was – I guess you could say the third – they have three facilities now. One, this rural facility in Y. Is your position that the fourth casino is at least 50 miles from Tucson when it's in Phoenix? Yes. Okay, fine. I got you. I was saying that you can't imply any additional term into the contract, both because we have an integration clause which says this is the whole agreement and no other statement, agreement, or promise shall be valid or binding. And in any event, the additional clause that they want to imply, which I must say to this day they have not been able to articulate, it's something like no casino in the Phoenix area. That is not consistent with the existing contract. It contradicts the express language of the compact that says that the nation can game anywhere on its Indian lands with the caveat that if there are four casinos, one of them has to be at least 50 miles from Tucson. And in any event, as Judge Campbell found, it defies common sense to think that the parties would have, quote, naturally omitted a ban on gaming in Phoenix. The plaintiffs told Judge Campbell that the state considered this issue to be of nuclear importance, and the notion that a provision so important would not be included, but instead the state would agree to an integration clause that says this is the whole agreement and no other statements or promises have any effect is, I think, incoherent. Now, the other side argues that it was always understood and the nation always represented that it would not open a casino in Phoenix. There is nothing in the record that demonstrates that the nation ever made such a representation. In fact, there is also no question in the record that Mr. Dahlstrom, who was the lawyer for the Gila River Band, expressly advocated the inclusion in the compact of a ban on gaming on after-acquired lands, and the state separately, quote, wanted that both in the 1993 compact and in the 2002 compact. And, in fact, as our brief points out, Mr. Dahlstrom's point for this, we want to include a ban on gaming on after-acquired lands because he said the Chiricahua Apache have their historic lands in the Phoenix area, and unless we do that, they may get recognition and could open a casino. All of the other tribes rejected the proposal to include an after-acquired lands ban when it was proposed by the state, when it was part of legislation introduced by the state, and when Mr. Dahlstrom, Gila River's lawyer, proposed it, including, as we point out, I think the citations are, well, I can't remember what page of our brief, including, ironically, by Salt River, who spoke up and said we will never agree to that. They are now a plaintiff in this case. And so let me ask you a question about sovereign immunity. You say there's no evidence that they promised anything other than what's in the contract. I take that to be the case. Let me ask you a hypothetical. Suppose they went out into the parking lot and said, I'll tell you what, whatever's in the contract, we promise you that we won't build a casino in Phoenix. Could the tribe be sued for that? It could not be sued for that because the waiver of sovereign immunity under IGRA, I mean the nation is sovereign, and I think it's important, Judge Silverman, to recognize that it is a commonplace feature, as the Supreme Court recognized, I think, in the Bay Mills decision, it is commonplace in these compacts for the parties to waive sovereign immunity with respect to any dispute with respect to gaming or the compact. Not only was that not done in this case, but Section 16 of the compact expressly, affirmatively, reaffirms the sovereign prerogatives of the nation and the state. If you're right about that, Mr. Ellman says, then the tribe can really get away with pulling a fast one. Well, I mean, we dispute that the tribe did anything to pull a fast one, but the way that the state protects itself, just as the way the nation protects itself when the state pulls a fast one, is to negotiate, as IGRA expressly permits, a dispute resolution mechanism that includes a more expansive waiver of sovereign immunity. And that was considered, that was rejected. That is paragraph, the waiver of sovereign immunity is limited under 2710, and there was an express rejection by both sides, apparently, of any waiver of their sovereign rights in paragraph 16. So the answer is, if you negotiate a compact, and the compact doesn't include, that says you can game anywhere on your Indian lands, including equal footing lands, and this is the whole agreement, and no other promises or statements or agreements have any effect whatsoever, and there is no waiver of sovereign immunity, either by the state or the nation in this case, that's correct. Now, you know, the United States, you know, the nation has no sovereign immunity against the United States and the Secretary, but the state bargained for a very, very fulsome retention of sovereign immunity on both sides in this agreement. And as I said, it's reflected here. And the notion that even assuming their asserted facts were true, and Judge Campbell did take them as true, the notion that you could say, okay, well, we've had three years of negotiations, including years of negotiations about a ban on gaming on after-acquired lands, which was rejected every single time, including, and again, here the record is undisputed. We've cited the authorities on page five of our brief. The nation expressly, on two different occasions, in two different years, bringing the Lands Replacement Act to the attention of the state so that the state understood what the after-acquired lands consequences could be in this case. I reject the notion that the nation did anything untoward, but I recognize that as Judge Campbell did, you have to take the facts in a light most favorable to the plaintiffs, but you do have to examine those facts, as Judge Campbell did, based on what their evidence really was, not what the overblown characterization of that evidence is in their briefs. So, you know, in short, we think that this is a case in which, you know, we took issue with Judge Campbell about whether federal interpretive principles or the state of Arizona interpretive principles need to apply, but we think that he got it absolutely right when even applying Arizona's more relaxed version of the parole evidence rule, he concluded that there is no reasonable reading of the compact that could lead a person to conclude that it prohibits new casinos in the Phoenix area. Now, I adverted to this, but I didn't really explain it. The question is, you know, what is this additional term that they want to put in here? We propounded interrogatories when they filed their complaint that basically said, what do you think this geographic limitation is? And what they said is, well, there was an agreement not to open a new facility within, I believe it was 40 miles of the exterior boundary of Phoenix. When we pointed out in briefing that that includes not only the San Lucy District, the flooded area, but includes portions of the nation's main reservation. It includes the town of Gila Bend. It includes Florence. The nation has property as a reservation land in Pima County and in Maricopa County. They said, okay, well, maybe it doesn't mean that, and ended up with some six or seven paragraph articulation that essentially said, we don't have to define that term because this property just exterior of Glendale certainly is within that area. But they are asking the court to take the extraordinary step of inserting a term that nowhere appears in this compact and is inconsistent with the compact on a theory that everybody agreed that it would be the case and that it was, quote, natural to omit that nuclear term in the compact. And the very fact that during the year and a half, I think, or almost two years of litigation in front of Judge Campbell in this case, they never have been able to articulate what that supposed express geographic limitation is, I think speaks volumes about their argument that this court should reverse Judge Campbell and hold that there is such a term, however it is defined. Unless the court has further questions either on sovereign immunity or anything else in the case. I think co-counsel wants your attention, if I might. Oh. I think I was clear about this, but my co-counsel wants me to reiterate that this case is not about, and I believe Mr. Shah agreed, this case is not about the facility that's the subject of the 3C3 provision because there is a casino in Y and the nation only has three casinos. So the question is, what does it do? What limitations exist as to the location of the yet unopened fourth casino? And Judge Bea, the answer to that question is prescribed in Section 3J called location of facilities. Very well, counsel. Thank you very much. Thank you. Mr. Shah, your side has a few minutes reserved. And may I suggest that you respond to Mr. Waxman's argument about the integration clause. That seems to be the integration clause. Sure, Your Honor. I will start there upon your suggestion. Your Honor, the fact that there's an integration clause under Arizona law does not mean that you look to the party's clear understanding of what the terms of the contract mean. The two critical cases under Arizona law, which both the parties spent ample time briefing, Johnson and Taylor, both had integration clauses in those contracts. And what the Arizona court says is, yes, an integration clause means you don't contradict the terms of the contract or read separate agreements into the contract. We are not, contrary to Mr. Waxman's characterization, we are not trying to seek to add or contradict terms in the contract. We want to construe the contract that exists to be consistent with the party's undisputed understandings during this evolution. So the fact that there's an integration clause does not preclude the court from looking at that overwhelming evidence of understanding of the terms of the contract, nor does it preclude the court from applying Restatement Section 2012, which, in fact, Restatement 201 was also an issue in Johnson. And what the Arizona courts have said is, look, we are different. We are different than the normal federal rule or the contract rule that most of you, most of us learned in contract law. You don't simply look for ambiguity in the contract and then go to the extrinsic evidence to see if that supports it. Instead, what you do is you look to see, can you read the contract in a way that gives effects to the party's meanings? Now, on summary judgment— Can I ask you this? Would you please comment on Mr. Waxman's statement that the Phoenix location comes within the description on page ER-739 under C-3? It is the one that's more than 50 miles from Tucson. Your Honor, that is the upshot of their reasoning. Even though that force—we're not saying that 3C-3 is violated in this case, but the upshot of their reasoning, which they make clear in their brief and which Mr. Waxman made clear here today, is they can close all rural facilities and locate them in Phoenix because Phoenix is more than 50 miles from Tucson. There is overwhelming—and this evidence is undisputed. I didn't understand that to be what he said. I understood what he said to be they've got three in Phoenix and they've got one that has to be 50 miles from Phoenix and the one that's in Phoenix is 50 miles from Tucson. Correct. So I don't want to put words in Mr. Waxman's mouth. My understanding is from their position that their rural Y facility, which is one of their four facilities, satisfied 3C-3, and we don't disagree with that. The rural Y facility satisfies 3C-3. Our point about 3C-3 is this. That limits them to the Tucson metropolitan market. That is, under their view, they can open an urban casino in any city in Phoenix. So if you read 3C-3 by its terms, that means they could open all four casinos in Phoenix. Now, that clearly conflicts with the understanding of what 3C-3 was supposed to do. What 3C-3 was supposed to do was to make sure that at least one of their casinos was in a rural area. Unless you read the gaming chart in 3C-5 to limit them to Tucson casinos in terms of their urban casinos, then they would no longer be limited to a rural casino. It would gut the meaning of 3C-3. That's our point as to 3C-3. Now, I want to respond. I want to be sure to respond to his point, Mr. Waxman's point, that we can't point to any evidence in the record that the nation made explicit representations that there would be no additional casinos. Your Honor, there is a mountain of evidence in the record. This is on summary judgment. You can look no further than ER-477. This is a document put out by the tribes jointly and, in fact, says that the nation was a major funder of this document. It says flat, there shall be no additional casinos in Phoenix under this compact. It's quoted. It's clear. ER-262-263, this is testimony from the executive director of the organization created by the tribes, including the nation, to do this. He points to two specific members of the nation that explicitly said in meetings with legislatures that there will be no additional casinos in Phoenix under the compact. You can look at other sites in our brief. It's not even a close call. Overwhelming evidence shows that that's the view they adopted. They knew that the state had that view. They knew that the other 20 compacting tribes had that view. That was the main sticking point over three years of negotiations. And how do you account for the fact that this critical point is not in the contract? Okay, so, Your Honor, there is direct testimony as to from the state's lead negotiator, point blank, a deposition, he was asked that very question. And it's a fair question. Why didn't you put it in explicit terms? And, obviously, that would have been the better practice. But his response, and this is an ER-209-2010 that's cited in our brief, is this. He said, look, the parties sat down in good faith. These are sovereign tribes. This is the state. For three years, the cornerstone of the scope of gaming chart was that the Phoenix area tribes could build in Phoenix. The Tucson area tribes could build in Tucson. That's reflected in every version of the gaming chart from 455 to 472 in the excerpts of record. And he said that was the cornerstone. It simply was understood by everyone to impose that limitation. And I know it's hard coming to this record cold when you read the contract and see, well, no, you don't understand that. But for the folks who lived through this negotiation and its explicit testimony on summary judgment, the only reason they didn't put it in there is because they said everyone, there was no doubt everyone shared that understanding. It was as if the sky was blue. That was the cornerstone from which they negotiated. And none of the provisions of the compact, quite frankly, make sense. Thank you, Counsel. Your time has expired. Thank you, Your Honor. The case just argued will be submitted for decision, and the court will take a ten-minute recess.
judges: O'scannlain, Silverman, Bea